## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

C.A. Barnett, (Y20852),        )
                                     )
                Petitioner,    )
                                     )      Case No. 21 C 50198
        v.                )
                                     )      Hon. Iain D. Johnston
                                   )
Tiffanie Clark, Warden,       )
Illinois River Correctional Center,   )
                                   )
              Respondent.   )

## <u>MEMORANDUM OPINION AND ORDER</u>

Petitioner C.A. Barrett, an inmate incarcerated at the Illinois River Correctional Center and presently on medical furlough,[1] brings this *pro se* habeas corpus action pursuant to 28 U.S.C. § 2254 challenging his predatory criminal sexual assault of a child conviction from the Twenty-Third Judicial Circuit Court, DeKalb County, Illinois.   The Court denies the petition and declines to issue a certificate of appealability.

## I.   Background

The Court draws the following factual history from the state court record (Dkt. 1, 8, 10.) and state appellate court opinions, *Illinois v. Barnett*, 2018 IL App (2d) 170248-U ("*Direct Appeal*"); *Illinois v. Barnett*, 2020 IL App (2d) 190666-U ("*Postconviction Appeal*").   State court factual findings, including facts set forth in state court appellate opinions, have a presumption of correctness, and Petitioner has the burden of rebutting the presumption by clear and convincing evidence.   28 U.S.C § 2254(e)(1); *Tharpe v. Sellers*, 138 S. Ct. 545, 546 (2018); *Hartsfield v.*

---

1 The Illinois Department of Corrections' inmate locator webpage for Petitioner shows his parent institution is the Illinois River Correctional Center and that he is presently on medical furlough. The Court understands this to mean that Petitioner remains in the custody of the Warden of the Illinois River Correctional Center.

*Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) (citations omitted). Petitioner has not made such a showing.

Petitioner was convicted of sexually assaulting his step-granddaughter at least 20 times when she was between the ages of three and seven years old. *Postconviction Appeal*, at ¶ 6. The assaults occurred between 1999 and 2003. *Id*. The victim did not initially come forward but did so at the age of 16 after her younger half-sister alleged that she had been sexually abused by Petitioner in a similar fashion. *Direct Appeal*, at ¶ 12. The victim was a few days short of her nineteenth birthday when she testified at trial. *Id*. at ¶ 9. Petitioner testified on his own behalf denying that he abused the victim or the victim's half-sister. (Dkt. 1-1, pgs. 154-55.)

According to the victim, Petitioner touched her vagina with his hand on the outside and the inside, under her clothing. *Direct Appeal*, at ¶ 10. He also had her masturbate him by moving her hand up and down on his penis until he ejaculated. *Id*. Petitioner began the assaults by telling the victim she was his favorite and that they were going to play a game. *Id*. at ¶ 11. After the assaults, Petitioner warned the victim to not tell anyone because it would ruin their family. *Id*. The assaults occurred at Petitioner's home in the victim's bedroom, the living room, and the basement. (Dkt. 1-2, pg. 101.) The victim explained most of the abuse occurred when Petitioner came into her bedroom while she was asleep or trying to sleep. *Direct Appeal*, at ¶ 11.

Petitioner's home was in Genoa, Illinois. *Id*. at 100-03. He married the victim's paternal grandmother when the victim's father was 12 years old, and the victim considered Petitioner her grandpa. *Direct Appeal*, at ¶ 10, 21. The victim's father lived in Petitioner's home until he graduated high school and joined the military. *Id*. The victim was born while her father was in the military, and at some point, her mother and father divorced, her father left the military, and he

returned back to live at Petitioner's home.  *Id*.; (Dkt. 1-2, pgs. 161-62.)   The victim lived with her mother, also in Genoa.  *Direct Appeal*, at ¶ 10.   The victim's father had visitation rights every other weekend from Friday through Sunday bringing the victim to Petitioner's home for the visits when he lived there.  *Direct Appeal*, at ¶ 21.

The victim's father moved out of the Petitioner's home to an apartment in Malta, Illinois[2] by 2001, eventually remarrying and having two additional children.  (Dkt. 1-2, at pgs. 99, 120, 163, 168, 183, 250.)   One of these children was the victim's younger half-sister who would also later accuse Petitioner of sexual abuse.  *Id*.   The victim testified that Petitioner's abuse of her began while her father lived in Petitioner's home and continued after her father moved out.  *Id*. at 113-14, 119.

After the father moved out of Petitioner's home, the victim spent Friday nights during her father's visitation weekend at Petitioner's home, played soccer on Saturday, and then her father picked her up from soccer and took her to his apartment for the rest of the weekend.  *Id*.   The victim, her mother, and her father all testified at trial that the victim stayed at Petitioner's home without her father on Friday nights for Saturday soccer after her father moved out.  *Id*. at ¶¶ 15, 17, 26.

The abuse, as best as the victim could remember, lasted until she stopped playing soccer. *Direct Appeal*, at ¶ 10.   She explained that it was hard for her to identify the precise dates of the abuse, but she testified that "the more I thought about it," the more she realized the abuse continued until she quit soccer.  (Dkt. 1-2, pg. 127.)   Per the victim, "that was the reason I stopped soccer. I loved it, but I had to stop because I couldn't put myself in that situation every other weekend."

---

2 Although the majority of the record states that the victim's father lived in an apartment in Malta, Illinois, there is testimony in the record suggesting the father (perhaps at a later time) also lived in Dixon, Illinois.

3

*Id*. To determine the timeline of the abuse, the victim looked at her soccer trophies and saw that she had trophies through age seven. *Id*. As she had no additional trophies past 2003, she concluded she stopped playing soccer (and Petitioner's abuse of her ended) at that time. *Id*.

Genoa is approximately 30 miles southeast of Rockford, and Malta is approximately 20 miles southwest of Genoa. *See* Google Maps, *available at*: shorturl.at/qsL16 (last visited Feb. 14, 2023). As the victim's father put it during his testimony, "Whenever --- every other weekend that I had her when she had a soccer game she would stay at the defendant's house because we lived in Malta and we were trying to save gas money instead of going to Genoa Friday night, driving back to Malta, then turn around Saturday morning, driving back to Genoa and then back to Malta." (Dkt. 1-2, pg. 251.) On those Friday evenings, the arrangement was that either Petitioner, the victim's grandmother, or the victim's aunt and uncle picked her up from the victim's mother's home and drove her to Petitioner's home before her Saturday soccer game. *Id*. at 116.

Petitioner disputed the soccer arrangement at trial. He and his wife (the victim's grandmother) testified that the victim stayed in their home for visits only when her father lived in the home, and there was no arrangement for the victim to stay by herself on Friday nights before Saturday soccer after Petitioner moved out. (Dkt. 1-2, pgs. 163, 168-69, 171-73, 185.) Petitioner also countered that it would be impossible for him to pick up the victim on Friday nights or abuse the victim at night (the victim claimed much of the abuse occurred at night after she went to bed) because he worked an overnight shift as a machinist. *Id*. at 167. Regarding Petitioner's work schedule during that time, his supervisor testified that Petitioner's work shift was from "3:30 to 11:30 or if we were working overtime anywhere between 2:30 and 3:30 a.m." *Id*. at 229.[3]

---

[3] The state appellate opinion states the supervisor testified that Petitioner's shift was from 2:30 to 3:30 a.m. to 11:30 a.m." *Direct Appeal*, at ¶ 24. This is an erroneous reading of the record as it is clear from the transcript that the

The victim's mother testified that the victim's behavior changed dramatically depending on whether her father would be present at Petitioner's home during a visit. When her father picked her up for a visit, the victim, according to her mother was, "All happy go lucky, running to him, giving him big hugs and kisses." (Dkt. 1-2, pg. 133.) However, when she was taken to Petitioner's home by one of her grandparents or her aunt or uncle, the victim would "throw a fit" according to her mother. *Id*. The victim would "scream and holler and cry, 'I don't want to go,' and I had to ask her why." *Id*. The mother explained that the victim said, "'It's dad's day, not --- weekend, not theirs. It's Dad's weekend." *Id*. The victim also testified that when she found out that her father and stepmother were going to have a baby girl, the victim told Petitioner that "she'd rip his balls off" if he ever assaulted her sister. *Direct Appeal*, at ¶ 11.

To rebut the testimony of the victim's animosity towards him, Petitioner introduced into evidence 13 pictures from that period purporting to show that he had a positive relationship with the victim. *Id*. at 165-67. Although the pictures are not in the instant record, Petitioner described them in his testimony without objection. *Id*. In one picture, the victim at age three is sitting on Petitioner's lap steering a riding lawnmower. *Id*. at 166. In another, the victim and Petitioner are sitting side by side in lawn chairs. *Id*. Other pictures are of the victim, Petitioner, and other family members participating in family events such as weddings, birthdays, and Christmas. *Id*. at 164-66. The victim's grandmother also testified that the victim and Petitioner got along, and the victim did not make any complaints about Petitioner during this period. *Id*. at 185.

---

supervisor testified the shift started in the afternoon and ended in the early morning. (Dkt. 1-2, pg. 229.) Moreover, the supervisor's affidavit in support of the state postconviction petition states Petitioner's shift started between 2:00 and 3:00 p m., and would usually end between 2:00 and 3:00 a.m., the next morning with overtime sometimes going until 5:00 a m. (Dkt. 1-3, pg. 411.) Petitioner and his wife also provided affidavits in support of his postconviction petition consistent with this time frame for his work shift of starting in the afternoon and ending in the early morning. *Id*. at 397, 400.

Petitioner's wife, his brother, his supervisor, and his supervisor's wife provided reputation testimony that Petitioner was not the type of person who had the propensity to sexually assault young girls. *Direct Appeal*, at ¶¶ 22-25. On the propensity issue, the prosecution called the victim's younger half-sister to testify regarding Petitioner's abuse of her. (Dkt. 1-2, pgs. 141-42.)

The half-sister, who was nine years old at the time she testified, said that Petitioner was her grandpa and she would go over to his home to visit. *Direct Appeal*, at ¶ 18. Sometimes during the visits, Petitioner would touch her "private" with his hand, both under and over her clothes. *Id*. The assaults occurred in the living room, when her grandmother and brother were in the kitchen and not able to see into the room. *Id*. She explained that she stopped going to Petitioner's home when she was five. *Id*.

The victim's sleeping arrangements at Petitioner's home was an additional focus of the trial because, as mentioned, she testified most of the abuse occurred when Petitioner came into her bedroom at night. The home's upstairs had three bedrooms: (1) the victim's father's bedroom, (2) Petitioner and his wife's bedroom, and (3) an extra third bedroom that had a daybed and did not have a door. *Direct Appeal*, at 4. The victim and her father both testified that the victim slept in the third bedroom by herself and did not sleep with her father when he lived in Petitioner's home. (Dkt. 1-2, pgs. 118, 250.) Petitioner and his wife disputed this testifying that the victim and her father slept together in his bedroom. *Id*. at 163, 184. The victim further explained that she slept in her father's old bedroom after he moved out and she stayed at Petitioner's home for soccer. *Id*. at 101. Petitioner and his wife, as mentioned above, dispute that the victim ever stayed over by herself for soccer after her father moved out. *Id*. at 163, 168-69, 171-73, 185.

6

Petitioner's wife further testified that she never recalled the Petitioner leaving the bed after they went to sleep, and that she was a light sleeper suggesting she would have heard her husband if he was moving around the upstairs. *Id*. at 184-85. Petitioner and his wife both testified that the floors creaked on the second floor. *Id*. at 159, 184.

Petitioner's counsel attempted to impeach the victim with her lack of an initial outcry and purported inconsistencies in her statements to the Illinois Department of Children and Family Services (DCFS). Regarding the fact that she did not initially report the abuse when it occurred, Petitioner explained that she thought at the time that no one would believe her because she was a little girl. *Direct Appeal*, at ¶ 11. The victim also initially denied any abuse when her father asked her following her half-sister's outcry of abuse, and the victim also denied abuse in a first DCFS interview, but later reported the abuse in a second DCFS interview eight days later. *Id*. at ¶¶ 13, 14. The victim explained at trial that she ultimately reported the abuse in her second DCFS interview because the abuse made her feel lonely and misunderstood, and she did not want her younger half-sister to feel the same way. *Id*. at ¶ 13. The victim also agreed that she told the DCFS investigator that the floors upstairs creaked and that Petitioner would sometimes stop as he approached her bedroom due to the sound, but at trial testified that it was the floors downstairs that creaked not the upstairs floors. *Id*. at ¶ 16.

At the completion of the trial, the jury found Petitioner guilty of the predatory criminal sexual assault of the victim. *Id*. at 27. The prosecution *nolle prossed* the charges relating to the abuse of the half-sister and a third child. *Id*. The trial court sentenced Petitioner to 12 years of imprisonment. *Id*.

The Appellate Court of Illinois affirmed on direct appeal. *Direct Appeal*, ¶ 58. Petitioner then brought a state postconviction petition alleging ineffective assistance of trial counsel regarding his impeachment of the victim and failing to introduce certain evidence and testimony at trial. *Postconviction Appeal*, at ¶ 2. The trial court dismissed the petition, and the appellate court affirmed. *Id.* The Supreme Court of Illinois denied Petitioner's petition for leave to appeal completing the state postconviction proceedings. *Illinois v. Barnett*, No. 126344, 159 N.E.3d 973 (Ill. Nov. 18, 2020) (Table).

## II. Analysis

Petitioner now brings the instant habeas corpus petition renewing the ineffective assistance of trial counsel claim for failing to: (1) interview and call Zach Botts as a witness; and (2) present additional impeachment and exculpatory evidence of: (a) Petitioner's Friday night work schedule; (b) photographs showing the victim played soccer later than 2003; (c) a DCFS report regarding the victim's statement that she locked a bedroom to prevent abuse; and (d) additional witnesses showing that the victim had a good relationship with Petitioner. Additionally, Petitioner alleges the state appellate court failed to apply the correct standard under *Strickland v. Washington*, 466 U.S. 668 (1984), when rejecting Petitioner's arguments. As a result, he argues the Court should review the claim *de novo* instead of under the deferential standard required by the Antiterrorism and Effective Death Penalty Act (AEDPA). The Appellate Court of Illinois decision on postconviction appeal is the last reasoned state court decision to resolve Petitioner's ineffective assistance of counsel claim on the merits, *Postconviction Appeal*, at ¶¶ 1-44, making it the relevant decision for the Court's review. *Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012) (citing *Green v. Fisher*, 565 U.S. 34, 40 (2011); *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006)).

8

Under the AEDPA, the Court may not grant habeas relief unless the state court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or the state court decision is based on an unreasonable determination of facts. 28 U.S.C. § 2254(d). "The AEDPA's standard is intentionally 'difficult for Petitioner to meet.'" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014); *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)). This "'highly deferential standard [] demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

The clearly established federal law comes from *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate ineffective assistance of counsel, Petitioner must show both deficient performance and prejudice. *Premo v. Moore*, 562 U.S. 115, 121 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). The Court's review of counsel's performance is, itself, deferential under *Strickland*, 466 U.S. at 689 ("a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"), and applying *Strickland* under the AEDPA (which, as stated above, also requires deference) results in a double level of deference to the state court determination. *Knowles*, 556 U.S. at 123.

Petitioner cannot demonstrate the state appellate court's rejection of his claim was contrary to, or an unreasonable application of, *Strickland*. The state court correctly identified and applied the controlling *Strickland* standard. *Postconviction Appeal*, ¶¶ 26. Petitioner cannot make a contrary to argument.

9

The state court also reasonably applied *Strickland* when rejecting Petitioner's claim. "The Supreme Court insists that judges must not examine a lawyer's error (of omission or commission) in isolation." *Williams v. Lemmon*, 557 F.3d 534, 538 (7th Cir. 2009) (per curiam) (citing *Strickland*, 466 U.S. at 690-96). "It is essential to evaluate the entire course of the defense, because the question is not whether the lawyer's work was error-free, or the best possible approach, or even an average one, but whether the defendant had the 'counsel' of which the sixth amendment speaks." *Id*. A review of trial proceedings as a whole show that trial counsel provided a vigorous and comprehensive defense of Petitioner.

First, in trial counsel's pretrial actions, counsel aptly recognized that Petitioner faced multiple accusers and did his best to remove the second accuser, the victim's half-sister, from the case. The prosecution initially charged Petitioner for abuse against both children, and Petitioner's counsel moved to sever the charges so only those regarding the victim would go forward in this case. (Dkt. 1-3, pg. 107.) Additionally, he attempted to bar the introduction of the half-sister's testimony as propensity evidence. *Id*. at 146-49; (Dkt. 1-2, pgs. 27-30.) The trial court allowed the half-sister's testimony, and the state appellate court affirmed the introduction of the evidence as consistent with Illinois law. *Direct Appeal*, at ¶¶ 29-42. Although trial counsel was unsuccessful in excluding the half-sister's testimony, his effort is evidence of the competency of his performance.

Moving to the trial itself, defense counsel provided a consistent theme in his opening statement. He carried the theme through the examination of witnesses and the introduction of evidence, and reaffirmed the theme in closing argument. He noted the importance of questioning the victim's credibility and highlighted areas for the jury to focus on during the testimony including

10

where she slept in Petitioner's home, and that she initially denied the allegations against Petitioner before changing her story.   (Dkt. 1-2, pgs. 90, 92-93.)   Defense counsel also pointed out to the jury that it would be hearing evidence that Petitioner worked at night, *id*. at 91, and that the jury should remember that Petitioner was not being charged with a crime regarding the victim's younger half-sister as it would be hearing her testimony.   *Id*. at 92.   He asserted Petitioner's presumption of innocence and reinforced the prosecution's burden of proving Petitioner guilty beyond a reasonable doubt.   *Id*. at 95.

Defense counsel followed through during the evidence with the structure of Petitioner's case presented to the jury in opening statements.   Counsel provided a comprehensive cross-examination of the victim in an attempt to challenge her credibility.   The victim's testimony on direct examination spans eight and half pages, *id*. at 97-106, while the cross-examination spans 14 pages of the trial transcript.   *Id*. at 107-124.   Defense counsel brought out on cross examination that the victim: (1) initially denied any abuse when questioned by her father and later DCFS; (2) that the details of her abuse that she ultimately disclosed to the DCFS investigator were not 100% consistent with the abuse she testified to at trial; (3) her statement to the DCFS investigator about the dates of the abuse were not 100% consistent with her trial testimony; (4) inquired about her statements about going to Petitioner's home after her father moved out due to her Saturday soccer; (5) which bedroom she slept in at Petitioner's home; and (6) whether the upstairs floors creaked and her statement to the DCFS investigator about the creaking floors.   *Id*.

Trial counsel also provided additional points for Petitioner's defense.   He called Petitioner to testify denying the abuse allegations, and called Petitioner's wife, his brother, supervisor, and supervisor's wife as character witnesses.   *Direct Appeal*, at ¶¶ 22-25.   He also introduced

11

evidence of Petitioner's work schedule (confirmed by his supervisor's testimony) to suggest that Petitioner was not at home at night because Petitioner claimed the abuse occurred mostly at night. *Id*. at 167, 229.   He also introduced pictures showing that Petitioner and the victim had a positive relationship to rebut the victim's testimony.   *Id*. at 165-67.   Finally, trial counsel followed through with these themes and points in closing arguments keeping a consistent narrative throughout the case.   *Id*. at 89-95.   Ultimately, the jury chose to credit the prosecution's witnesses, and disbelieve the defense's, when it found Petitioner guilty, but a review of the record shows Petitioner was represented by constitutionally competent counsel.

Petitioner also raises individual concerns regarding counsel's performance.   Before turning to these individual matters, the Court is mindful that a "single error may suffice" for a *Strickland* violation when it is sufficiently "'egregious and prejudicial,'" *Williams*, 557 F.3d at 538 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)), but that is the exception to the general rule of viewing counsel's performance as a whole.   *Coleman v. Neal*, 990 F.3d 1054, 1056 (7th Cir. 2021) (per curiam) ("*Strickland* says [] that it is the full course of representation that matters. There is a potential exception for a whopper of an error that nullifies all of the good things that counsel did . . . .") (citing 466 U.S. at 690-96; *Williams*, 557 F.3d at 538).

Petitioner first argues that trial counsel was ineffective for failing to interview and call Zach Botts as a witness.   Botts is the victim's cousin; their common grandmother is Petitioner's wife.   (Dkt. 1-3, pg. 421.)   He provided an affidavit in support of Petitioner's state postconviction petition expressing his belief that Petitioner was innocent.   *Id*. at 422.   The affidavit explained that Botts also lived in Genoa and was approximately 13 years old at the time that the victim's father lived at Petitioner's home during the abuse of the victim.   *Id*. at 421.   He explained he

would regularly visit Petitioner's home on Saturday mornings at that time because he was very close to the victim and her father. *Id.* He considered the victim's father to be a second father to him. Botts stated in his affidavit that "it was obvious" to him that the victim and her father slept in the same room because the bed in the third room appeared like it had been unused when he visited on Saturday mornings. *Id.* He also asserted that the victim and her father were very close meaning that he expected her to sleep in the same bed as her father. *Id.* Finally, Botts also explained that Petitioner appeared to be a good grandfather to the victim, and that the victim and Petitioner appeared to him to have a good relationship. *Id.* at 422.

Although the state appellate court did not specifically say so, it is clear that the state court rejected the argument under *Strickland's* prejudice prong by explaining that the issues of the victim's sleeping arrangements and relationship with Petitioner was thoroughly covered during the trial and Botts purported testimony would not help on that point. *Postconviction Appeal*, at ¶¶ 29-30. It is acceptable to reject a *Strickland* claim solely under the prejudice prong, and AEDPA deference applies to the state court's determination. *Gage v. Richardson*, 978 F.3d 522, 528 (7th Cir. 2020).

When, like in this case, there is a "standoff between two factions in this family," "independent corroboration by a neutral, disinterested witness" would be "extremely significant" and the failure to investigate and call that witness can be ineffective assistance of counsel. *Montgomery v. Petersen*, 846 F.3d 407, 414 (7th Cir. 1998); *see also Goodman v. Bertrand*, 467 F.3d 1022, 1030 (7th Cir. 2006) (finding failure to call "disinterested witness" who was "crucial aspect" of the case was ineffective). In *Montgomery*, the neutral, disinterested witness was a store clerk who provided a solid alibi for the defendant at the time of a residential burglary. *Id.* at 413.

The store clerk was the only witness who had no motive suggesting bias. The rest of the case presented a swearing contest between the defendant's half-brother who was also his purported accomplice in the crime (who testified for the prosecution) aligned against family and friends who also served as alibi witnesses for defendants. *Id*. at 413-14. The store clerk was viewed as a neutral tiebreaker, and the failure to investigate and call the store clerk was deficient performance. *Id*. at 414.

Unlike the store clerk in *Montgomery*, Botts does not serve as a neutral tiebreaker, but instead is a family member aligning himself with one side of the dispute. Petitioner argues Botts is neutral because he cared for the victim and saw her father as a second father. But, unlike in *Montgomery*, he is not a stranger like the store clerk in that case. Botts is in no better position than the Petitioner's wife, the victim's mother and father, or any other family member who observed Petitioner and the victim during this period.[4]

Additionally, Botts's purported testimony does not resolve the family standoff. The clerk in *Montgomery* provided a solid alibi to the burglary charge, but there is no equally powerful testimony from Botts. Botts said he believed that the victim slept with her father, but he concedes he came over on Saturday mornings and so did not view where the victim slept the night before.

---

4 Petitioner also faults his attorney for not calling his son, Michael Barnett, and grandson, Christian Barnett, to testify in an attempt to rebut the victim's testimony about not wanting to be around Petitioner. The Barnetts, like Botts, also provided affidavits in support of Petitioner's postconviction petition asserting that their observations of Petitioner and the victim suggested to them that the victim had a good relationship with Petitioner. (Dkt. 1-3, pgs. 416-19.) The Barnetts are arguably more biased witnesses because unlike Botts, who is a blood relative to the victim, the Barnett's are Petitioner's blood relatives and are the victim's step-uncle and step-cousin, respectively. Regardless, like Botts, they do not provide new evidence beyond what Petitioner provided at trial in terms of pictures in support of his position that he had a good relationship with the victim, and his wife's testimony in support of him. But, as discussed above, Petitioner's family is clearly divided over the abuse allegations with some members believing Petitioner and other believing the victim. Adding three additional family members to Petitioner's side of the ledger does not demonstrate a reasonable probability that the outcome of the trial would have been different. To put a fine point on it, this family division was clearly presented to the jury and the jury believed the victim. The state court's rejection of this argument is neither contrary to, nor an unreasonable application of, *Strickland*.

14

Equally, the sleeping arrangement is only one part of this case. The victim testified that she was assaulted by Petitioner in multiple parts of the home, not just the bedroom. Additionally, the victim testified that she slept in her father's bedroom by herself after her father moved out. Botts only speaks to visiting the victim when her father lived at Petitioner's home, and does not address the victim's testimony that the abuse continued when she stayed at Petitioner's home for soccer after her father moved out. In sum, the state court's determination on the Botts issue is not contrary to, nor an unreasonable application of, *Strickland*.

Petitioner's remaining arguments challenge trial counsel's failure to introduce additional evidence that Petitioner believes contradicts the victim's version of events or is exculpatory. The state appellate court rejected the arguments on the merits, *Postconviction Appeal*, ¶¶ 31-38, so the Court applies the AEDPA's deferential review. *Gage*, 978 F.3d at 528.

Before turning to the initial issues, the Court notes that these arguments nibble around the edges of the case. All relevant issues were comprehensively presented to the jury by defense counsel, but the jury reject Petitioner's view of the case and instead credited the prosecution's. As discussed above, defense counsel's performance, when viewed in totality, demonstrates that Petitioner received a constitutionally proper defense in accordance with the Sixth Amendment.

Turning to the issues raised by Petitioner, he first argues two issues regarding his work schedule. As discussed above, Petitioner and his supervisor testified to his work schedule explaining that his work shift was approximately 3:30 p.m. to 11:30 p.m., and as late as 2:30 or 3:30 a.m. when working overtime during the period of the abuse. (Dkt. 1-2, pgs. 167, 229.) Petitioner pointed to his work shift schedule for two purposes: (1) the victim alleged that the majority of the abuse happened at night after she went to bed; and (2) the victim claimed either he,

his wife, or the victim's aunt and uncle would pick up the victim on Friday evenings from her mother's house to stay over at his home for Saturday soccer after the victim's father moved out. Petitioner attempts to argue that he could not have committed the abuse because he worked overnight, and also could not have picked up the victim from her mother's on Friday evenings because he was at work.

As to the first point, the work shift schedule evidence showed that Petitioner worked until sometime in the middle of the night giving him multiple hours to return home and abuse the victim. The jury could easily conclude that Petitioner finished his shift, arrived home sometime between midnight and four a.m., and abused the victim while everyone else was asleep in the house.[5]

Petitioner now claims that his attorney was ineffective for failing to explicitly identify the days he worked. He believes the jury might have erroneously believed that he did not work on Fridays or Saturdays. But, as mentioned above, his work shift information does not help him because he could have easily made it home to abuse the victim overnight. At most, the only issue is Petitioner's argument that he could not have picked up the victim, but the testimony was that Petitioner was one of several people including her grandmother, aunt or uncle who also picked her up on Friday.

---

[5] As mentioned, the supervisor testified at trial that he and Petitioner both worked the second shift that ran from 3:30 p.m. to 11:30 p.m., and to 2:30 a.m. or 3:30 a.m., if they worked overtime. (Dkt. 1-2, pg. 229.) Perhaps recognizing that his supervisor's testimony created a timeline of him to return home in the middle of the night that was consistent with the victim's testimony that he often came into her bedroom to assault her after she had gone to sleep, Petitioner, his wife, and supervisor all provided affidavits in support of Petitioner's postconviction petition that extended the work schedule later. Petitioner and his wife now claim he worked from 2:00 p.m. to 2:00 a.m. with overtime going until 5:00 a.m. (Dkt. 1-3, pgs. 397, 400.) And the supervisor changes his recollection with a 3:00 or 4:00 p.m. start time until 2:00 or 3:00 a.m., and overtime until 5:00 a.m. *Id*. at 411. However, the supervisor's original trial testimony is what it is. He testified at trial that Petitioner's work traditionally ended around 11:30 p.m. leaving many hours for Petitioner to return home and assault the sleeping victim. Moreover, if this new timeline is believed, it still gives Petitioner multiple hours overnight after work to commit the abuse while the rest of the house was asleep.

The only new piece of evidence that Petitioner provides in his affidavit that was not before the jury on his schedule issue is that he was an over-the-road trucker from May 2002 to August 2003. (Dkt. 1-3, pg. 397.) He explains that he worked his factory job, which was discussed at trial, from December 2000 through May 2002, worked as a trucker from May 2002 through August 2003, and then returned to his factory job in August 2003. *Id*. at 396-97. Petitioner claims he drove almost 3000 miles a week and was gone for one or two weeks at a time while working as a trucker. *Id*. at 396. He claims he was only home for one or two days a week and gone many weekends while driving trucks. *Id*.

Assuming for purposes of the argument that Petitioner was out of the home as he claimed while working as a trucker, the state court correctly noted that this would not impeach the victim's abuse allegations. *Postconviction Appeal*, at ¶ 32. The victim alleged the abuse began in 1999, and even the Petitioner and his wife agreed that the victim's father moved out of their home by 2001. (Dkt. 1-2, at pgs. 99, 120, 163, 168, 183, 250.) His purported time as a trucker does not address the period from 1999 through March 2002 when the victim testified the abuse occurred including the period from 2001 to 2002 after her father left the home.

Finally, Petitioner argues that the state court erred in its application of the *Strickland* standard by requiring Petitioner to prove his innocence when addressing the work schedule issue. (Dkt. 1, pg. 22.) To establish prejudice under *Strickland*, Petitioner "does not have to prove actual innocence; he does not even have to show that counsel's errors more likely than not altered the outcome in his case. He must show only a reasonable likelihood that the outcome would have been different . . . ." *Blackmon v. Williams*, 823 F.3d 1088, 1107 (7th Cir. 2016). The state court faithfully applied this standard. *Postconviction Appeal*, at ¶ 32 ("These observations [regarding

Petitioner's work schedule] are not an improper attempt to have defendant prove actual innocence, but rather are part of a prejudice analysis, which leads to the conclusion that defendant failed to make a substantial showing that there was a reasonable probability that the trial would have resulted differently had this evidence been presented.").

The state court properly rejected Petitioner's work schedule arguments. Petitioner cannot show the state court ruling is contrary to, or an unreasonable application of, *Strickland*.

Petitioner next argues that his lawyer was ineffective for not introducing pictures suggesting that the victim played soccer later than 2003. The victim's grandmother included three photographs with her affidavit in support of Petitioner's postconviction petition. (Dkt. 1-3, pgs. 404-409; Dkt. 13.) Two of the pictures have dates written on them of "Fall 2004" and "Fall '06." *Id*. at 401-02. The grandmother explains she received pictures at that time, and also believes she received the undated picture either in 2005 or 2007. *Id*. Finally, the grandmother explains the handwriting on the back of the pictures is the victim's step-mother's. *Id*.

Leaving aside any admissibility concerns regarding the pictures and the writing, the Court agrees with the state appellate court that trial counsel's failure to introduce these pictures at trial does not constitute ineffective assistance of counsel. As the state court noted, there is no requirement in Illinois law for the prosecution to prove the exact date of the sexual abuse because it is often difficult in child abuse cases for the victim to pin down the exact time, date, and location of the abuse especially when the abuse occurred over a prolonged period. *Postconviction Appeal*, at ¶ 34 (citing *Illinois v. Bishop*, 843 N.E.2d 365, 374 (Ill. 2006); *Illinois v. Letcher*, 899 N.E.2d 315, 320 (Ill. App. Ct. 2008)).

18

The victim's testimony was in line with this principle as she explained that it was difficult to identify the specific dates of the abuse, and instead determined the timeline based on when she stopped playing soccer. Additionally, as the state appellate court noted, the victim was clear she deduced the end of her time playing soccer by looking at her trophies, not based on an independent recollection of dates. *Postconviction Appeal*, at ¶ 34. The state court reasonably concluded that the failure to introduce the pictures was a matter of trial strategy by counsel because they could have "harmed defendant's case by suggesting that the abuse took place beyond 2003" because the victim would have "logically testified that the abuse must have therefore occurred until 2006." *Id*. The state court's rejection of the argument is correct, and therefore, Petitioner cannot demonstrate that the state court ruling was contrary to, or an unreasonable application of, *Strickland*.

Petitioner next argues that his lawyer was ineffective regarding a statement that the victim made about locking a door. The DCFS report memorializing the victim's interview states that "When she was seven dad moved to Dixon and she was not at grandpa's much and she would lock her door." (Dkt. 1-3, pg. 423.) Petitioner points out that the third bedroom in his home with the day bed does not have a door, and the lock to the door to the father's old room was painted over and inoperable. *Id*. at 398, 402.

The state appellate court rejected the claim noting that it was not clear what door was referred to in the DCFS statement. *Postconviction Appeal*, at ¶ 36. Petitioner reads the statement to be that the victim is saying she locked her bedroom door at his home to prevent him from coming in to abuse her. The Court rejects Petitioner's reading of the record. The state appellate court's finding that the statement is unclear regarding what door is at issue is both accorded a presumption

19

of correctness that can only be rebutted by clear and convincing evidence, 28 U.S.C § 2254(e)(1); *Tharpe*, 138 S. Ct. at 546, and the evidence in the record supports the state court finding. The DCFS statement in the record does not explain whether the victim is referencing a door at her father's apartment, Petitioner's home, or some other location.

Moreover, even if the door referenced is the victim's bedroom door in Petitioner's home, as the state court pointed out, the victim testified that she was abused in various parts of the home, not just the bedroom. *Postconviction Appeal*, at ¶ 36. And, finally, any impeachment value of the victim would be certainly offset by introducing a harmful fact to Petitioner that the doors did not lock in his home suggesting that he could easily let himself in the victim's bedroom when she was sleeping. A competent attorney could understandably not want that tradeoff. The state appellate court's rejection of Petitioner's argument on this point is neither contrary to, nor an unreasonable application of, *Strickland*.

Finally, Petitioner argues this Court should apply a *de novo* standard instead of the deferential AEDPA standard when reviewing Petitioner's *Strickland* claim in this case. This is a "contrary to" argument. A state court ruling is "contrary to" clearly established federal law from the Supreme Court when the "state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002); *McNary v. Lemke*, 708 F.3d 905, 913 (7th Cir. 2013) (citation omitted) (explaining a "state court's decision is 'contrary to' federal law if it employs the wrong legal standard established by the Supreme Court."). "Where the state court's decision is "contrary to" federal law, that decision is not entitled to the usual AEDPA

deference and is therefore reviewed *de novo* with the reviewing court applying the correct legal standard." *Mosley v. Atchison*, 689 F.3d 838, 844 (7th Cir. 2012).

Petitioner's *de novo* argument focuses on *Strickland's* requirement that counsel's performance must be evaluated as a whole instead of viewing individual instances in isolation. *Myers v. Neal*, 975 F.3d 611, 623 (7th Cir. 2020). A review of the state court decision shows that it faithfully applied this requirement. The state court highlighted trial counsel's effort of cross examining the victim "in detail," including her initial denial of any abuse when first confronted by her father and the DCFS investigator after her younger half-sister's allegations against Petitioner, and her changes in her story including the ages that the abuse occurred. *Postconviction Appeal*, at ¶ 43. The state court also examined how trial counsel brought in witnesses to testify on Petitioner's behalf, and also cross-examined the prosecution's other witnesses. *Id*. Furthermore, the state court explicitly stated it was examining the cumulative nature of counsel's performance and any alleged error. *Id*. at ¶¶ 42-44. Thus, this case is unlike *Myers* cited by Petitioner where the state court erred by limiting its examination to individual allegations of deficient performance and then concluding no cumulative analysis was required due to the lack of any individual error. 975 F.3d at 623. The state court did not err in its application of the *Strickland* standard. Petitioner's *de novo* argument is rejected. And, for completeness purposes, the Court notes that even if this case was reviewed under a *de novo* standard, it would still deny the habeas corpus petition because there is no *Strickland* violation in this case.

In sum, all of Petitioner's arguments are meritless, and consequently, the state appellate court's rejection of Petitioner's arguments is neither contrary to, nor an unreasonable application of, *Strickland*. The habeas corpus petition is denied on the merits.

21

The Court declines to issue a certificate of appealability. Petitioner cannot make a substantial showing of the denial of a constitutional right, and reasonable jurists would not debate, much less disagree, with this Court's resolution of Petitioner's claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

## III.  Conclusion

Petitioner's habeas corpus petition (Dkt. 1.) is denied on the merits. Any other pending motions are denied as moot. The Court declines to issue a certificate of appealability. The Clerk is instructed to: (1) terminate Respondent Clark, (2) add Cherryle Hinthorne, Warden, Illinois River Correctional Center as Respondent; (3) alter the case caption to *Barnett v. Hinthorne*; and (4) enter a Rule 58 judgment in favor of Respondent and against Petitioner. Civil Case Terminated.

ENTERED:

Dated:  February 27, 2023

_____
IAIN D. JOHNSTON
United States District Judge